IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| JOHN LYNAM, | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| vs. | ) | CIVIL ACTION NO. 15-378-CG-C |
| | ) | |
| BISHOP STATE COMMUNITY | ) | |
| COLLEGE, and ALABAMA | ) | |
| COMMUNITY COLLEGE | ) | |
| SYSTEM, | ) | |
| | | |
| **Defendants.** | | |

## MEMORANDUM OPINION AND ORDER

This matter is before the Court on Defendants' motion for summary judgment (Doc. 46), Plaintiff's opposition thereto (Doc. 54), and Defendants' reply (Doc. 57). For the reasons explained below, the Court finds that Defendants' motion is due to be granted.

## I. Background

This case arises from Plaintiff's termination from Bishop State Community College ("Bishop State"). The Complaint asserts two counts: (I) that Defendants intentionally interfered with employment relations and (II) that Defendants discriminated against Plaintiff on the basis of his race in violation of Title VII of the Civil Rights Act of 1964. (Doc. 1). Count I was dismissed by this Court on December 1, 2015.[1] (Doc. 17). Thus, the only claim remaining is Plaintiff's Title VII racial discrimination claim.

---

[1] Plaintiff's claim for punitive damages was also dismissed. (Doc. 17).

In response to Defendants' motion for summary judgment Plaintiff concedes that the facts stated by Defendants in their summary judgment brief are accurate. In fact, Plaintiff incorporated those facts "the same" in his responsive brief. (Doc. 54, p. 1). They include the "agreed facts" stated below.

## II. Agreed Facts

Plaintiff John Lynam (Caucasian) was employed by Bishop State as its Executive Director of Workforce Development for two months - from December 2013 through January 2014. He was a full-time, probationary (non-tenured) employee during his brief period of employment. Lynam reported to Kathy Thompson (African-American), the Dean of Technical Education and Workforce Development. Thompson recommended Lynam's termination. Thompson reported to James Lowe (African-American), then-President of Bishop State. Lowe interviewed and selected Lynam for the Executive Director position and terminated Lynam on Thompson's recommendation. Lowe died in February 2015.

The Position Announcement for the position of Executive Director of Workforce Development stated that the person selected would "analyze, develop and coordinate business-industry needs for the county and city, promoting Bishop State Community College's academic and technical programs as the primary source for meeting those workforce needs." Essential job functions included providing leadership to the Technical Education Division, promoting and assisting in the

establishment of Bishop State's academic and technical programs, designing and implementing a "Business Service" approach, serving as a liaison to local and regional economic development organizations, designing continuing strategic workforce development plans, creating training opportunities for Bishop State, seeking external funding for College projects, and working in collaboration with other Bishop State, business, and industry teams.

The Executive Director position was posted on August 5, 2013, and Lynam submitted his application on August 13. The Executive Director position was a new position at Bishop State. A Screening Committee, composed of six individuals, reviewed the applications, determined that Lynam met the minimum requirements for the position, and selected him as one of six candidates for an interview. After interviewing the six candidates, the Screening Committee recommended three candidates for the President's consideration, in no particular order: Harrietta Eaton (African- American), Jessica James (Caucasian), and Lynam. Lowe interviewed the candidates, and invited Thompson and Marcella Sims (Director of Human Resources) to attend the interviews. Lowe selected Lynam for the position, and Lynam began employment in early December 2013.

Lynam believes that Thompson did not want him in the position because she instead wanted to "bring her person from Georgia."  Though Lynam did not know that person or anything else about that person, he believed "[i]t was a male African American," though he acknowledged "I do not know that to be fully true." Lynam

based his assumption about the person's race on a photo in Thompson's office taken of her with an African-American man, though Lynam does not know if that was the person she wanted hired. Lynam did not hear from anyone else that this person was African-American, and he just assumed, without any basis, that the person in the photograph was who Thompson wanted hired. Lynam knew of no other identifying characteristics about this person, and did not know whether or not he had applied for the position. Lynam heard "gossip" from Sheria Mitchell (African American), a College employee who also reported to Thompson, that Thompson wanted to bring in someone from Georgia. Mitchell did not tell Lynam that person was African-American. Mitchell testified that Thompson wanted to hire a white male from Georgia with whom Thompson had previously worked.  Lynam swore under penalty of perjury in his EEOC Charge of Discrimination as follows: "I have since learned that my supervisor, Dr. Kathy Thompson, wanted me fired because she wanted one of her own African-American candidates hired for the Executive director position."

He stated similarly in an interrogatory response "I believe [my termination] was based on my race because I was told that [Thompson] had wanted Dr. Lowe to hire an African-American candidate that she wanted, and he did not." Lynam's deposition testimony contradicts his EEOC and discovery statements and demonstrates he had no factual basis for asserting that the person Thompson wanted hired was African.

Thompson testified that she wanted a candidate from Georgia, named Tol

Williams, for the position. Williams is a Caucasian male, the same race and gender as Lynam. Thompson and Williams had previously worked together and she encouraged him to apply. Williams applied for the position and was one of six candidates selected for an interview by the Screening Committee, but he was not selected for a final interview with the President.  Lynam does not know if Thompson's person from Georgia even applied for the position, but he believes Thompson wanted "to discredit all three applicants [Lynam, James, and Eaton] so she could bring her own person in." Thompson told Williams that she would let the College know that she had worked with him in the past and would do anything she could to help Williams get the position, even though it was not her decision to make. Thompson told Lowe that she hoped Williams would be selected for the position, and Lowe told her that if Williams was selected by the Screening Committee for a final interview, he would hire him. But Williams was not selected for a final interview.

After sitting in the interviews of the final three candidates - Lynam, James, and Eaton - Thompson recommended to Lowe that none of them be hired for the Executive Director position because she felt none of them were a good fit or had the background that Thompson needed to support her and carry out her vision. She suggested the position be readvertised to see if there were other applicants of more substance. Despite her recommendation, Lowe offered Lynam the position, and Thompson accepted Lowe's decision and was committed to moving forward.

5

A few days before beginning his employment at Bishop State, Lynam met with Thompson for about 30 minutes. They discussed his position, and Lynam found out that he would have staff reporting to him. Lynam told Thompson at this meeting that his ex-wife had cancer.  Lynam also met with Lowe briefly before he started work.

On Lynam's first day of work, Monday, December 2, 2013, Lynam discussed his job duties with Thompson and was directed by her to create a workforce development plan. Lynam also met with other Bishop State employees on his first day.

On Tuesday December 3, his second day, he went to the office, spoke with Thompson, met with Sheria Mitchell (who was to report to Lynam), and met with Brad Wallace at the Truck Driving School that morning. According to Thompson, Lynam did not arrive at work before 9:00 a.m. without any explanation for his late arrival. According to Lynam, Thompson told Lynam at the Truck Driving School that if he performs the way a former employee, Jim Kellen, performed, he would "suffer the same fate as Mr. Kellen, and not work here any more." Lynam does not know what Kellen's position was or why he was terminated; he only contends that there was a connection between himself and Kellen because they were "both white males." Kellen worked at Bishop State in workforce development before Thompson did, and reported to Lowe. Thompson testified that she never said that Lynam would be fired like Kellen. Kellen was the former Bishop State Director of

Workforce Development. He applied for the Dean of Technical Education and Workforce Development position that Thompson was hired for, and retired after he did not get that position. Kellen and Thompson never worked together at Bishop State. According to Thompson, Lynam did not return to his office at the Southwest Campus after the meeting at the Truck Driving School as she expected him to.

Lynam started his third day, Wednesday, December 4, meeting Mitchell at the main campus at 9:00 a.m. He did not report to the Southwest Campus before this meeting at 8:00. Thompson's office was located on the Southwest Campus (located on Dauphin Island Parkway), and Lynam's office was there too. The Main Campus is on Broad Street. He emailed Thompson about introducing her to a representative of Infirmary Health, which Thompson responded to, by asking Lynam to meet with her that day. Lynam asked for clarification regarding whether the meeting was just with her or with the Infirmary Health representative. Thompson clarified that she wanted to meet with Lynam that day to hear about his progress regarding his work plan. She instructed Lynam that she did not want to meet with someone until she has more information regarding their position, how the meeting will benefit Bishop State, the purpose of the meeting, and what Lynam hopes to gain from it.

Thompson emailed him again that morning regarding his job duties. It stated:

7

John,

Your office at the SW campus is ready for you to occupy. The office will be your primary location and where you begin your day and end your day until you become integrated into the flow of activity and work responsibilities.

Please refrain from attempting to redefine the job of executive director of workforce development (you were hired to carry out) as if you are an independent agent or consultant. If you have the wrong impression of the job, let's discuss it and clear it up. Let me be clear, you do not work independently of me, your staff and Bishop State. The most productive and successful new work relationships begin with your desire to learn why my priorities and goals are as the Dean and then for you to work to carry them out. This should be your first and only priority. I greatly appreciate your eagerness to connect me with the business and industry community; however Dr. Lowe and my staff have done an excellent job of integrating me into it. Plus, it is my natural tendency to network across a broad spectrum of sectors and I have done this quite effectively.

Please keep in mind that you do not have leave (sick, vacation or personal) earned that allows you to be away from the office for any reason.

Again, if there is anything related to the job you do not understand, please address it with me asap. As you are aware, I am accessible 24 hours a day.

Thank you.

Lynam did not have any accrued vacation, sick time, or annual leave. He understood his work hours were 8:00 a.m. to 5:00 p.m.

Lynam met with Thompson later that day. According to Lynam, Thompson told him that he should have delayed his hiring given his ex-wife's condition. Thompson also said that Lynam should not be working independently of her and was unhappy that Lynam was trying to introduce her to industry representatives. He thought that she "took it the wrong way." Lynam also claims that Thompson made a comment in this meeting about Lynam's lack of prior experience at a

historically black college ("HBC" or "HBCU"), although he does not remember how that subject came up, why she said it, or anything else from the meeting. Lynam concedes that this comment did not relate to his race. Thompson denies making such a remark to Lynam, and testified that she did not have any experience at a historically black college until Bishop State either. Even so, Lynam has no evidence to suggest that Thompson's comments about his ex-wife or his lack of HBC experience were because of his race.

Thompson recalls that she told Lynam she was not pleased with his behavior and thought he did not understand that this position required him to first become acclimated to Bishop State before he could go out and speak for the College. She explained that his work hours were 8:00 to 5:00, and that his office was at the Southwest Campus. Thompson wanted a proposal of how Lynam planned to carry out his workforce development activities and what strategies he would employ over the next year. She indicated that the meeting would serve as his first warning and that the next meeting would be their final.

Lynam left around 3:30 or 4:00 on December 3rd or 4th to go to the hospital to see his ex-wife with his children. Thompson sent an email to Lowe on the evening of the 3rd regarding her concerns about Lynam's work hours and said that Lynam texted her at 3:00 p.m. that day to tell her that his ex-wife was in the hospital and that he was going to take his children to see her. Thompson also complained to Mitchell that Lynam had left work without permission. Thompson asked Mitchell

sometime that week what she thought of Lynam, and Thompson told Mitchell that she did not think Lynam was going to work out, without explanation.

On Lynam's fourth day, Thursday December 5, Lynam attended a meeting at Infirmary Health on behalf of Bishop State at 7:00 a.m. for two hours, and then arrived at the Southwest Campus at 10:00 a.m., met with Thompson and a student, and left at 4:30 to have dinner with a representative of Hargrove.

On Friday, December 6, Lynam did not report to work because his ex-wife passed away. He emailed Thompson that morning to let her know, and said he would touch base with everyone later that morning. He did not report to work that day and did not speak with anyone at Bishop State that day, except that he emailed Gloria Knight in Human Resources. He told Knight that he knew he hadn't accrued any off time but he needed to be with his children that day.

The following day, Saturday, December 7[2], Lynam spoke with Thompson by phone regarding taking an unpaid leave of absence because of his ex-wife's death. According to Lynam, Thompson told Lynam that she wanted him to take leave, and that he had no option. Thompson testified that she recommended that he take the leave because she thought he needed to be with and help his three children who just lost their mother; she thought "it was the humane thing to do" and made "a lot of

---

[2]  The facts stated in Defendants' brief list the date as December 6, but the deposition testimony cited in the brief (Doc. 46-1, p. 56) refers to Saturday, December 7.

sense to me, being a mother, that you would want to spend that time with your children." After his ex-wife passed away, Lynam was solely responsible for the care and custody of his three minor children. She does not recall Lynam refusing or telling her that he did not want to take leave. Lynam was placed on leave without pay from December 6, 2013 until January 1, 2014. He did not report to work the following Monday, and did not discuss any concerns he had with the leave with Lowe, anyone in Human Resources, or anyone else at Bishop State. He attended a professional development seminar in mid-December, with Thompson's approval, and attended the Bishop State Christmas luncheon. However he did not report to work on any other days and did not ask to return from his leave sooner. The College was also closed for some time over the holidays.

Lynam returned to work on Thursday, January 2, and spent the day in the office at the Southwest Campus. On Friday, January 3, Lynam spent the day at his office, had a meeting with department chairs, and a meeting with Thompson. On Monday, January 6, he met with Thompson briefly, worked on plans and a proposal, but did not have any other meetings. On Tuesday, January 7, Lynam met with Mitchell and Thompson, separately.

On Wednesday, January 8, Lynam was called into Lowe's office to meet with Lowe and Sims, and Lowe told Lynam that he was being terminated. Lynam received a letter in this meeting from Lowe informing him that his employment would be "discontinued after January 31, 2014;" no reason was given in the letter.

Lowe told Lynam that it was "not working out" between Lynam and Thompson. Lynam responded that he wanted "to go on the record" to say that he "did not ask to be put on leave," and that it had come to his attention that Thompson "did not want to hire me in the first place." Lowe replied that Lynam should talk to Thompson. Lynam returned to the Southwest Campus and Thompson would not see him. A security guard brought Lynam a second letter from Lowe stating that he would be on paid administrative leave until January 31, 2014. Lynam did not go back and talk to Lowe and he never talked to Thompson about why he was terminated.

Lowe made the decision to terminate Lynam, as only he had the authority to terminate employees as President of Bishop State. Lynam alleged in his complaint that he was terminated on the basis of race for taking a leave of absence. Lynam does not have any evidence that Lowe terminated him because of his race, that Lowe harbored any discriminatory animus against him because of his race, and Lynam has no reason to believe that he would have been treated differently if he was African-American or another race.

Thompson submitted a letter to Lowe on January 2 recommending that Lynam be terminated based on his performance before his leave of absence. She stated in the letter that it was her opinion that Lynam was "not a good fit as the executive director, Workforce Development based on the following facts." She stated in the letter that Lynam requested to work from home or from his car, that he believed that his job was 100% in the community and that he was also responsible

for managing a staff and programs. She was advised that Lynam told his staff they were free to end their workday following the completion of any task and were not required to remain at work. She stated that his hours were 8:00 to 5:00 but that he did not consistently report to work on time or leave on time. She expressed concern that on his fourth day, Lynam met with an architectural firm to develop internships, but that Lynam was not familiar with the programs of study at Bishop State and the types of internships that were needed. Finally she stated that she received notice from Lynam that his ex-wife had passed away and that he would not be in the office on December 6, and that he agreed to take an unpaid leave until January 2 to address the personal issues related to the passing of his ex-wife.

Thompson maintained a memorandum intended for Lynam's personnel file that she used to prepare the letter recommending Lynam's termination. It elaborated on what she stated in her termination recommendation letter, and included concerns that Lynam wanted to work from home and that he did not arrive at the campus by 8:00 a.m. every day. The memorandum also included an email to Lowe on Lynam's second day expressing concerns that Lynam was unwilling to commit himself to the job he was hired to do and had no intentions of managing his staff. She said, "I do not believe John Lynam has any intentions of working with my team and me, if it means there are expectations that require him to be present, responsible and contribute as part of a team. He wants to operate independently and without any expectations other than he will use his connections to help BSCC.

13

Call me old fashioned – I believe when you start a new job, the goal should be to demonstrate interest in the job, a commitment to the job, and an effort to fulfill the job expectations. I have not seen any of this. I recommend that we move to terminate him immediately." Thompson also included emails between her and Lynam, including the email described above on December 4 that asked Lynam to refrain from redefining his job. Finally, Thompson stated in the memorandum that she learned from her administrative assistant Ida Watson Pines (African-American) that Lynam informed his staff that they are free to leave work early. She testified that Watson was told this by Sheria Mitchell, who later confirmed it when she met with Thompson. Thompson submitted an affidavit to the EEOC which also stated her reasons for recommending that Lynam be terminated. She summarized his activity during the first week of his employment, as she did in her memorandum and in her letter recommending termination, and stated that the recommendation had nothing to do with Lynam's race.  There are a few inconsistencies between Thompson's letter recommending termination and her memorandum regarding the times that Lynam reported to work. The memo stated that Lynam appeared at work at 9:00 a.m. on his second day, December 3, and attended a meeting at 9:00 a.m. on December 5. However, in her letter to Lowe recommending Lynam's termination, Thompson wrote that Lynam began his day on December 3 at 10:00, and on December 5 at 10:00. Her affidavit to the EEOC is consistent with her memorandum. She does not remember why the times on her letter recommending

14

termination are inconsistent with the memorandum she prepared. Whether she noted a 9 a.m. or 10 a.m. arrival time, both times are after the 8 a.m. expected start time, and she noted that Plaintiff was late at least two days during his first week of employment.

Thompson testified that she had an "instinct" that Lynam would be a problem because he asked to work from his home, and indicated that he did not want to come to work every day. Because of this she started taking notes and paying attention. She also testified that although Lynam was supposed to work with outside business leaders, "it wasn't time yet. He didn't know anything about the organization, but he's supposed to go outside and talk to the business industry about Bishop State and really didn't know what we were trying to accomplish." "[B]eing out in the community a hundred percent of the time, that's not working as a team."

Lynam testified that his evidence of Thompson engaging in race discrimination was "the way she spoke to" him, that she was "demeaning, very degrading" towards him. When asked if race was the only reason why Thompson wanted to terminate Lynam, Lynam responded, "Yes and no. I guess she didn't like me." Yet he does not know why Thompson did not like him, and has no evidence that she did not like him because of his race. Thompson never called him any insulting or race-based names, never made any racially insensitive jokes, and never spoke of race, except for her comment regarding HBC work experience. When asked

15

in deposition what evidence he had to support his claim that Thompson wanted Lynam terminated because of his race, he said, "it couldn't have been anything else. I had been there twenty-four hours, what else could it have been? It had to have been that."

Thompson testified that she does not believe that an African-American should have been hired as Executive Director of Workforce Development, or that African-Americans should be given preference in hiring at Bishop State. Race was "absolutely not" a factor in her recommendation to terminate Lynam; his race made no difference to her. Williams never observed Thompson show favoritism towards anyone, especially on the basis of race.

Following Lynam's termination, the Executive Director of Workforce Development position was not readvertised or filled. Lynam claims that Ida Watson Pines ("Watson") (African- American), Thompson's assistant, assumed some of his duties when he left. However he does not know if Watson ever took leave or ever spent substantial time off-campus.

Watson is the Workforce Development Coordinator at Bishop State, and worked as Thompson's administrative assistant when Thompson worked at the College from 2013 to 2015. Watson worked for Kellen before she worked for Thompson. After Lynam left Bishop State, Watson did not take on any of his job duties and her job duties did not change. She has never taken any extended leave

16

from the College other than regular vacation time.

Beyond his own issues with Thompson, Lynam cites other employees who had problems with her. According to Lynam, Sheria Mitchell (African-American) said that "Kathy was very demeaning to her and to the staff . . . I think her words was crazy that she used with me . . . She was not rational." Lynam testified that Thompson's behavior to Mitchell was similar to Thompson's behavior with him. Mitchell told Lynam that many employees had problems with Thompson, morale was declining, she degrades and talks down to people, and people wanted to quit because of her. Lynam thinks Thompson was a bad manager because she was "very derogatory towards people and couldn't communicate very well."

Lynam produced a letter from "Concerned Employees – Bishop State Community College," written by Mitchell, to show "the pattern of Kathy Thompson . . . of havoc, mean spirited, degrading, that I was not the only person she had an issue with obviously." Lynam does not have any firsthand knowledge of what was claimed in the letter. The only reference to race in the letter is an allegation that Thompson herself referred to another instructor as a racist, but Lynam does not have any knowledge of when she made this statement, to whom she made this statement, or the race of the instructor to whom she was referring.

The College's files contained numerous complaints against Thompson, from both Caucasian and African-American employees, including several by Mitchell and

April Payne, both of whom are African-American. A petition was signed by 16 employees, of which approximately half were African-American and half Caucasian, stating that they had no confidence in Thompson. Mitchell testified that she felt she worked in a hostile working environment, that Thompson made derogatory comments towards her, would sabotage her work, and defamed her character. She also testified that Thompson was disrespectful and untruthful to "[p]robably everybody that worked for her," including April Payne (African-American), Mitch Higginbotham (Caucasian), Jason Corley (Caucasian), and Roderick McSwain (African- American), and testified that Thompson also had disagreements with "almost everybody at the school at some point in time," including with Dean McCane (African-American), Dean Allen (African-American), Dr. Chucks (African-American), Mr. Grayson (African-American), and Prescilla Andrews (African-American). Mitchell filed her own grievance against Thompson, claiming she was subjected to a hostile work environment. Payne and Higginbotham also filed grievances against Thompson. Ida Watson Pines was aware that several employees had conflicts with Thompson, including Payne. Watson has no reason to believe that these conflicts were because of anyone's race.

## III. Discussion

### A. Summary Judgment Standard

Federal Rule of Civil Procedure 56(a) provides that summary judgment shall be granted: "if the movant shows that there is no genuine dispute as to any material

fact and the movant is entitled to judgment as a matter of law." The trial court's function is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). The mere existence of a factual dispute will not automatically necessitate denial; rather, only factual disputes that are material preclude entry of summary judgment. Lofton v. Sec'y of Dep't of Children & Family Servs., 358 F.3d 804, 809 (11th Cir. 2004). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Anderson, at 249-250. (internal citations omitted).

Once the movant satisfies his initial burden under Rule 56(c), the non-moving party "must make a sufficient showing to establish the existence of each essential element to that party's case, and on which that party will bear the burden of proof at trial." Howard v. BP Oil Company, 32 F.3d 520, 524 (11th Cir. 1994)(citing Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986)). Otherwise stated, the non-movant must "demonstrate that there is indeed a material issue of fact that precludes summary judgment." See Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991). The non-moving party "may not rely merely on allegations or denials in its own pleading; rather, its response .... must be by affidavits or as otherwise provided in this rule be set out specific facts showing a genuine issue for trial." Vega v. Invsco Group, Ltd., 2011 WL 2533755, *2 (11th Cir. 2011). In reviewing whether a non-moving party has met its burden, the Court must draw all

justifiable inferences in favor of the non-moving party. <u>Tipton v. Bergrohr GMBH-Siegen</u>, 965 F.2d 994, 998 – 99 (11th Cir. 1992) (internal citations and quotations omitted).  Thus the inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." <u>Liberty Lobby</u>, 477 U.S. at 251–52.

**B.  Racial Discrimination Claim**

Plaintiff's complaint asserts a claim for racial discrimination against both Bishop State and Alabama Community College System ("ACCS").

**1. ACCS**

Defendants moved for summary judgment as to Defendant ACCS, arguing that Plaintiff does not allege any facts in the complaint to show that anyone at ACCS discriminated against Plaintiff on the basis of his race.  In his response, Plaintiff did not oppose these arguments or even mention ACCS.

"In opposing a motion for summary judgment, a 'party may not rely on his pleadings to avoid judgment against him.'" <u>Resolution Trust Corp. v. Dunmar Corp.</u>, 43 F.3d 587, 592 (11th Cir. 1995), <u>cert. denied sub nom.</u>, <u>Jones v. Resolution Trust Corp.</u>, 516 U.S. 817 (1995)(citing <u>Ryan v. Int'l Union of Operating Eng'rs., Local 675</u>, 794 F.2d 641, 643 (11th Cir. 1986)).  Moreover, " [t]here is no burden upon the district court to distill every potential argument that could be made based upon the materials before it on summary judgment.  Rather, the onus is upon the parties to

20

formulate arguments; grounds alleged in the complaint [or answer] but not relied upon in summary judgment are deemed abandoned." Id. at 599 (citations omitted).

In the instant case, no facts have been offered to support a claim by Plaintiff against ACCS for racial discrimination.  The Court notes that in the heading of Plaintiff's response brief, Plaintiff listed only Bishop State as a Defendant and that in the body of the brief Plaintiff refers to a singular "Defendant" rather than to "Defendants."  The Court concludes that Plaintiff has abandoned his claim against ACCS.

### 2. Bishop State

Plaintiff opposes summary judgment as to his Title VII claim against Bishop State.  Title VII of the Civil Rights Act of 1964 makes it "an unlawful employment practice for an employer ... to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1). A plaintiff may prove discrimination by relying on either direct, circumstantial, or statistical evidence.  See Walker v. Nationsbank of Florida N.A., 53 F.3d 1548, 1555 (11th Cir. 1995).  Direct evidence is evidence which, "if believed, proves the existence of discriminatory motive 'without inference or presumption.' " Hamilton v. Montgomery County Bd. of Educ., 122 F.Supp.2d 1273, 1279 (M.D. Ala. 2000) (quoting Carter v. Three Springs Residential Treatment, 132 F.3d 635, 641 (11th

Cir. 1998)).  As the U.S. District Court for the Middle District of Alabama explained:

> Not only must it be evidence of discriminatory 'actions or statements of an employer' but the actions or statements at issue must 'correlate to the discrimination or retaliation complained of by the employee.' Further, the statements 'must be made by a person involved in the challenged decision' and must not be subject to varying reasonable interpretations.

Id. (quoting Lane v. Ogden Entertainment, Inc., 13 F.Supp.2d 1261, 1274 (M.D. Ala. 1998)).  No direct evidence of discrimination has been submitted to the Court.  None of the evidence offered proves without inference or presumption that the person who made the employment decisions did so based on Plaintiff's race.  Neither has Plaintiff attempted to show discrimination through statistical evidence.

A plaintiff may attempt to show discrimination based on circumstantial evidence through the application of the McDonnell Douglas burden-shifting analysis established by the Supreme Court. McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).  Under the McDonnell Douglas framework, a plaintiff must first raise an inference of discrimination by establishing a *prima facie* case. See Chapman v. AI Transport, 229 F.3d 1012, 1024 (11th Cir. 2000) (citing Combs v. Plantation Patterns, 106 F.3d 1519, 1527-28 (11th Cir.1997)).

In order to make out a *prima facie* case of discriminatory termination based on race, a plaintiff must show: "(1) that he is a member of a protected racial class, (2) that he was qualified for the position, (3) that he experienced an adverse employment action, and (4) that he was replaced by someone outside of his

22

protected class or received less favorable treatment than a similarly situated person outside of his protected class." Knott v. Grede II, LLC, 2016 WL 375148, at *2 (S.D. Ala. Jan. 28, 2016) (quoting Flowers v. Troup Cnty., Ga., Sch. Dist., 803 F.3d 1327, 1336 (11th Cir. 2015)).  The first prong is satisfied, as it is undisputed that Plaintiff is a member of a protected class.  There is also no dispute that Defendant suffered an adverse job action by being terminated.  However, Defendants contend that there is no evidence that similarly situated employees outside his classification were treated more favorably.  To be an appropriate comparator, the employee must be "similarly situated in all aspects." Holifield v. Reno, 115 F.3d 1555, 1563 (11th Cir. 1997).  "The comparator must be nearly identical to the plaintiff to prevent courts from second-guessing a reasonable decision by the employer." Wilson v. B/E Aerospace, Inc., 376 F.3d 1079, 1091 (11th Cir. 2004) (internal citations omitted). The evidence demonstrates that there are no similarly situated employees and that Plaintiff was not replaced by someone of another race.  Plaintiff concedes that the evidence does not support a *prima facie* case under the traditional McDonnell-Douglas framework. (Doc. 54, p. 5).  Plaintiff admits "there is neither a 'comparator' nor a replacement employee in this case."

However, Plaintiff asserts that he can nonetheless establish an inference of discriminatory intent based on circumstantial evidence.  Plaintiff is correct that "establishing the elements of the McDonnell Douglas framework is not, and never was intended to be, the *sine qua non* for a plaintiff to survive a summary judgment

23

motion in an employment discrimination case." <u>Smith v. Lockheed-Martin Corp.</u>, 644 F.3d 1321, 1328 (11th Cir. 2011).  "[T]he plaintiff will always survive summary judgment if he presents circumstantial evidence that creates a triable issue concerning the employer's discriminatory intent." <u>Id.</u> (citations omitted).  To create a triable issue of fact, the plaintiff must come forward with "a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker." <u>Id.</u> (footnote and citations omitted); <u>see also</u> <u>Chapter 7 Trustee v. Gate Gourmet, Inc.</u>, 683 F.3d 1249, 1256 (11th Cir. 2012) ("Whatever form it takes, if the circumstantial evidence is sufficient to raise a reasonable inference that the employer discriminated against the plaintiff, summary judgment is improper." (citations omitted)).

Plaintiff asserts that Thompson wanted to fire Plaintiff from the start. However, even if that were true, that by itself does not raise an inference that Thompson had any racial bias against Plaintiff.  An "employer may fire an employee for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason." <u>Nix v. WLCY Radio/Rahall Communication</u>, 738 F.2d 1181, 1187 (11th Cir. 1984).

The Court notes that the overwhelming testimony suggests that although many employees had issues with Thompson, the issues where not confined to her dealings with employees of a particular gender or race. Thompson appears to have had a pattern of conflicts with employees, but the pattern was with all employees,

24

not just Caucasian males.  Plaintiff testified that Thompson never called him any names based on his race, never made any racially sensitive jokes and never brought up or talked about race with Plaintiff. (Doc. 57-2, p. 8).

Plaintiff argues that although Thompson testified that she did not want to hire any of the three candidates who were recommended by the Screening Committee, she later hired one of the candidates, Harrietta Eaton, who is a black female.  However, the evidence presented indicates that Eaton was hired for assistance in a new program over a year after Plaintiff was terminated.  She was hired to fill a six-month independent contractor position and she was interviewed by the division chairs, Erica Hunter and Rick Everett, who then recommended Eaton to Thompson for the role. (Doc. 57-3, pp. 39, 42; Doc. 57-5).  This evidence does not suggest that Thomson preferred Eaton to Plaintiff for the position Plaintiff applied for and was hired.  The facts agreed to by the parties clearly indicate that Thompson did not want to hire Plaintiff or Eaton for that position.  Plaintiff thought Thompson wanted to hire a man from Georgia that Thompson previously worked with and Plaintiff assumed that person was African-American.  However, the person from Georgia Thompson wanted to hire was Tol Williams who is a Caucasian male, the same race and gender as Plaintiff.  Williams applied for the position but was not selected for a final interview with the President.  Thompson's preference for Williams clearly does not show racial bias or discrinatory intent.

Plaintiff argues that Thompson gave difference reasons why she

25

recommended Plaintiff be terminated.  However, Thompson recommended that Plaintiff be terminated more than once and the Court does not find her testimony to be inconsistent.  Plaintiff also points to inconsistencies by Thompson regarding the times she reported Plaintiff arrived to work during his first week in the position.  A memorandum Thompson prepared for Plaintiff's personnel file stated that Plaintiff arrived at 9:00 a.m. on December 3, at 9:00 a.m. and on December 5 attended a meeting at 9:00 a.m. and appeared at work at 10:00 a.m. that day.  Whereas in a letter to Lowe, Thompson wrote that Plaintiff began his day on December 3 at 10:00 a.m. and on December 5 at 10:00 a.m.  However, Thompson's statements were consistent in asserting that Plaintiff had arrived late and the fact that she was inconsistent regarding the precise time Plaintiff arrived is a minor detail that is not sufficient to raise an inference of intentional discrimination.  As stated earlier, even if Plaintiff could show that Thompson wanted him to be terminated from the start, such evidence simply does not raise an inference of racial discrimination.  Similarly, Plaintiff's argument that Thompson suggested he take a leave of absence and then sent an email to Lowe criticizing him for taking leave does not raise an inference of racial discrimination.  Such facts support the contention that Thompson wanted Plaintiff to be terminated, but do not indicate any racial animosity.

Plaintiff has failed to provide evidence that he was replaced by someone outside of his protected class or that Defendant treated similarly situated employees outside his classification more favorably and has not come forward with

"a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker." <u>Smith</u>, 644 F.3d at 1328. Accordingly, the Court finds that summary judgment is due to be granted in favor of Bishop State.

## CONCLUSION

For the reasons stated above, Defendants' motion for summary judgment (Doc. 46) is **GRANTED**.

**DONE** and **ORDERED** this 4th day of November, 2016.

/s/ Callie V. S. Granade
SENIOR UNITED STATES DISTRICT JUDGE

27